UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

UNITED STATES OF AMERICA,

                                              MEMORANDUM & ORDER
                                              16-CR-204

          - against -


FAITH ESIMAI,

                        Defendant.

-----------------------------------------------------------x

GLASSER, Senior United States District Judge:

The defendant was indicted in the United States District Court for the Southern District of New York in October 2009 and pleaded guilty to the violation of 18 U.S.C. § 1349, conspiracy to commit wire fraud and bank fraud.  She was sentenced on July 26, 2010 to imprisonment for a term of seventy months to be followed by a term of supervised release of three years and directed to pay restitution in the sum of $4,952,831.73 and forfeit to the Government criminal proceeds in the sum of $13,517,486.

Having served her sentence and released from prison, in March 2016 she was again indicted in the Eastern District of New York, charged with conspiracy to obstruct and obstruction of a judicial proceeding, namely the Judgement and Forfeiture Order in the Southern District case. At her arraignment on April 24, 2016, questions concerning her competency were raised by her counsel, ECF 19, and on May 4, 2016 her application for authority to appoint an expert was granted.  ECF 20.  A competency hearing was held thereafter on February 8, 2017 and completed

-1-

that day.  The entire record of 120 pages contains the testimony of three witnesses, two of whom were the experts for the parties and the third was the defendant.

Crucial to the ultimate determination of this case are the transcripts of two meetings on March 7 and March 8, 2016.  (G. Ex. 3, 4).  The first was between co-defendant Lydia Hills, an attorney, who is the defendant Esimai's niece, and the confidential informant (CI) who was wired to record their in person conversations, joined by the defendant, who participated briefly by telephone (G. Ex. 3).  The meeting was held in the office of Ms. Hills.  The second meeting, the next day, March 8th, was also recorded by the CI, the participants then being Lydia Hills, the CI and the defendant.

A reading of the transcripts of the conversations between Ms. Hills and the CI on March 1, 2016, ECF 1 at pp. 7-11, of which the Court takes judicial notice, Rule 201(c)(d) F. R. E., and on March 7, 2016, and the interpretation of them by the Government and its witness, compels the inference that the subsequent events that spawned this indictment were foretold.

I am aware that the issue before me is the competence of Ms. Esimai to stand trial and the relevance of that inference to that issue may be questioned.  The serious consequence for the life of this 71-year-old defendant to be made by the determination of this issue upon a record of 120 pages of testimony of essentially two disagreeing experts, is disquieting.  Repeated re-readings of the record of the hearing and the transcripts has ultimately driven me to conclude that it is that foretelling which casts a shadow over this sparse record and imperceptibly impacted upon the conclusions drawn from it.

The following is a review of that record:

## **Dr. Joel Morgan**

Joel Morgan, a clinical neuropsychologist, was the first and only witness called by the Government. His opinion as to the defendant's competence to stand trial was based upon his review of the transcripts of two recorded conversations of the March 7th and 8th meetings noted above; reports of examinations by her physician, Dr. Sandra Robinson, dated October 2, 2015 and April 16, 2016; his interview of the defendant and neuropsychological tests performed over a period of six hours.

He related that he found the defendant to be a friendly, co-operative and pleasant woman, who repeatedly complained of memory difficulty throughout the examination. His testimony consisted almost entirely, on direct examination, of an explanation of the nature and purpose of the various neuropsychological tests he performed and the significance of the score earned by the defendant on each.

He listed the tests he performed to be:

Government Exhibit (G. Ex.) 2:

- The Wechsler Abbreviated Scale of Intelligence Scale - 2nd Edition, which is a test of general intellect;

- Letter Fluency, Category Fluency, and the Boston Naming Test, all tests of language functioning, including word retrieval and confrontation naming;

- Trail Making Parts A and B, psychomotor tests measuring attention and executive functioning;

- Grooved Pegboard Test, which measures fine motor skills;

- California Verbal Learning Test - 2nd Edition, measuring verbal learning and memory;

- Rey-Osterrieth Complex Figure Test (and memory trial), which captures perceptual visual-spatial functioning/construction and nonverbal memory; the

- Test of Memory Malingering, the Victoria Symptom Validity Test, the Reliable Digit Span, and the California Verbal Learning Test - 2nd Edition Forced-Choice Recognition Trial, all tests of effort and validity;

- Minnesota Multiphasic Personality Inventory, 2nd Edition, Restructured Form (MMPI-2-RF), a test of emotional adjustment and personality.

He explained in broad strokes the methodology of the tests and how Ms. Esimai performed on each. Tr. at 15-27. Throughout that recitation, there was no explanation of the relationship between the test scores and her competence to stand trial, with one exception. The scores assigned to her memory-tests were attributed to "inadequate effort," a euphemism for malingering.

Dr. Morgan was then asked to answer the four questions he was retained as an expert to answer and which were specifically addressed to her competence to stand trial. Those questions were:

1. Does Ms. Esimai understand the charges against her? His response was that:

throughout my examination of her, she stated that she did not understand the charges against her; that she did not know why she was in trouble. She claimed to have no understanding of it. However, . . .particularly in the recorded conversations on March 8th and March 7th with the confidential informant and Ms. Hills, Ms. Esimai is heard speaking coherently, clearly without any evidence of confusion. She is with the conversation, tracking the conversation. She provides input to the conversation in the discussion of the plan.
She offers advice that is relevant to the conversation. Not once during either of those conversations does she claim to have any memory loss or evidence

-4-

any instance of forgetting or word finding or anything that would be consistent with having mental problems such as dementia.

> On interview with me, the examinee, Ms. Esimai, repeatedly claimed to have difficulty remembering basic facts of her life and claimed not to understand the charges against her.  Tr. at 29.

His assessment that she showed no evidence of forgetting or word-finding or anything that would be consistent with having mental problems, such as Dementia, is at odds with his Report, Gov. Ex. 2 at p. 2,  in which he refers to the April 16, 2016 letter of Dr. Robinson, her primary care physician, which describes her as being unable to recall objects, dates or the name of the president.  In that Report, he also alludes to the wiretap recordings as evidencing no cognitive impairment, G. Ex. 2 at p. 5, which is at odds with Dr. Robinson's letter which notes that Ms. Esimai's memory continues to be problematic and her cognitive skills are not improving.  D. Ex. A.

An objective line by line reading of those recorded conversations would not support the conclusion that she understood the charges against her.  There is not a line in the entire transcript of those conversations on which the charges are mentioned or insinuated, even obliquely, since she was not indicted until a month later.  His assessment of her participation in them as providing input in the discussion of the plan and offering advice that is relevant to the conversation is an exaggeration suggesting a predisposed interpretation.  The most relevant and instructive transcript is of the conversation Dr. Morgan had with the defendant at the time he conducted his psychological tests.  The importance of that dialogue for the disposition of this life-defining issue requires that it be reprinted at length.

DR. MORGAN:     So let me tell you that um I have been retained um, by um the ah government to exam you, to examine your mental abilities today as part of the legal issues um that you are facing and I will be writing a report ah of my findings which will go to the attorneys.

FAITH:          No problem.  What legal issues am I facing?

DR. MORGAN:     Tell me, why, what do you know about that?

FAITH:          I,... I'm not too sure all I know is that in my (UI) broker and ah the bank, I just did what the bank asked me to do (UI) we needed people with good credit they don't care about their income once their credit is good (coughs) and I did what they asked us to do.  They're the people with excellent credit but they're just nature off so, (UI) what they asked me for, other than that I don't what (UI) crime committed.

DR. MORGAN:     You're not, you're not sure what crime you're been charged with is that right.

FAITH:          That's what I think (UI)

DR. MORGAN:     Alright

FAITH:          Other than that I don't know.

DR. MORGAN:     What, well we'll talk about that a little later.  I just wanna get some basic information

DR. MORGAN:      When, when did you get out of prison?

FAITH:      Um, I think late, sometime last year.

DR. MORGAN:      What was the terms of your release do you know?

FAITH:      What do you mean?

DR. MORGAN:      Were there, were there any rules when you were released when you were released, rules that you had to follow.

FAITH:      I can't remember.

DR. MORGAN:      Well alright,

FAITH:      Tell me what are these rules?

DR. MORGAN:      The rules might be that you have, you have to be ah you can't use drugs, or you have to see a parole officer or something like that.

FAITH:      Yeah,., I see the parole officer but I never used drugs and I have never,..

DR. MORGAN:      Okay

FAITH:      ...used one of them, I would never.

DR. MORGAN:     Alright, before 2009 were you, were you ever sued by anybody?

FAITH:          Not that I know of, for what

DR. MORGAN:     For anything

FAITH:          I can't remember

DR. MORGAN:     Alright, before 2009 were you ever investigated?

FAITH:          I don't know.

DR. MORGAN:     You're not sure.  Were you in any legal trouble in your home country, Nigeria?

FAITH:          No

DR. MORGAN:     Are you in any current legal trouble right now?

FAITH:          No, just for what they sent me to prison for (UI) trouble right (UI) trouble again now

DR. MORGAN:     Yes.

FAITH:          What is the trouble, please tell me.

DR. MORGAN:     You're not sure.

FAITH:          No, tell me.

DR. MORGAN:     It's called short selling, short selling.  Selling properties for less than the mortgage and skimming money off the top.

FAITH:              No, I'm not in that

DR. MORGAN:         Okay,

FAITH:              No, it's for the foreclosure, just the foreclosure on my houses I'm
                    trying to stop, if anybody if anybody is trying to short sale I don't know

DR. MORGAN:         Okay.

FAITH:              But I just don't want to lose all my properties

DR. MORGAN:         I understand

FAITH:              in the bank

DR. MORGAN:         I understand, I understand.  Were you arrested?

FAITH:              No, for what?

DR. MORGAN:         For the short selling.

FAITH:              Not that I know of.

DR. MORGAN:         You're not sure, alright.  Do you owe the government money?

FAITH:              For what?

DR. MORGAN:         For, for the ah first offense that you did

FAITH:              No, I was judge could handle my case he say either you pay a ransom
                    or go to prison I said I don't have money to pay ransom so that's why.

DR. MORGAN:         Ransom?

FAITH:              She said I have to pay ransom or go to prison, so I said I don't have
                    money

DR. MORGAN:         So you went to prison?

FAITH:              Okay, so I went to prison, so now that I have done my time in prison, I
                    don't know why I am still being tried  I don't understand.

DR.  MORGAN:        Who is your lawyer?

FAITH:              I forgot who was my lawyer

DR. MORGAN:         Do you know what your lawyer's responsibility is, what your lawyer is
                    supposed to do.

FAITH:              To look into what is happening now and make sure.  I don't know, I
                    really don't know, I'm so confused, but I, I, I don't know what's going
                    on.

DR.  MORGAN:        Do you know?

FAITH:              I don't have any lawyer right now.

G. Ex. 5 at 30-32:

DR. MORGAN:         Okay, what possible penalty are you facing, do you know?

FAITH:              Right now?

DR. MORGAN:         Ah hum

FAITH:              I, I please tell me I don't know.  I don't know what I have done wrong.

-10-

DR. MORGAN:        Alright.  What does it mean to discuss a plea, did you ever hear plea

                   bargaining, what does that mean to you.


FAITH:             I don't know, they say please follow me I am wrong, I don't know.


DR. MORGAN:        You're not sure.


FAITH:             I'm not sure.


DR. MORGAN:        Alright, let me change the subject, who is Lydia Hills?


FAITH:             She's an attorney.


DR. MORGAN:        She's a lawyer, is she your lawyer?


FAITH:             No?


DR. MORGAN:        How do you know her?


FAITH:             I know her because one of my doctors in Boston say she help her to

                   close her Condo, okay  so see if she can help you (UI) that's why I

                   called her but I don't know.


DR. MORGAN:        Is she a Real Estate lawyer, Real Estate Attorney?


FAITH:             I don't know, I don't know much about her.

G. Ex. 5 at 30-34:

   2.  Is Ms. Esimai able to work with an attorney in a fashion motivated towards self-

interest?  Does she express herself in such a way as to communicate properly with her

representatives and, if need be, her own attorney?  Would she be able to testify: Why and why not?

> Again, from the recordings, she is a good communicator, she is knowledgeable.  She was active and a coherent, intelligent participant. Her conversations with me during my examination were fine. There was no difficulty with confusion or word finding.  I believe that she can easily work with her attorney on her best own behalf.  Tr. at 30-31

The formulation of that multiple question suggests that it was taken from a manual: "Communicate properly with her representative and, if need be, her own attorney?"  "Would she be able to testify?"  What do these questions mean?  Who are the "representatives" other than her lawyer she must be competent to communicate with?  Of critical importance is the absence of any indication of the purpose of the communication with her lawyer.  Is she competent to assist him in preparing a direct and cross-examination?  Is she competent to discuss progress of the trial; her defense?  What is meant by, "Would she be able to testify?"  Is the expert's response that she is, supported by the transcripts and his examination of her?  The transcripts of his interview of her reflects that over the course of 40 pages, she responded, "I don't remember" or its equivalent 48 times.

3.  The third question asked Dr. Morgan to opine about was her ability to comport herself, to which he responded that "her comportment is perfectly socially appropriate."  Tr. at 31.

That response echoed his report in which he wrote:

> "Across these numerous and disparate settings, Ms. Esimai consistently composed herself quite well and is socially and conversationally appropriate."

Engaging others with proper social graces is clearly one of her strengths." G. Ex. 2 at 13.

No mention is made by Dr. Morgan of the significance of her "social graces" to her competence to stand trial. That significance was specifically noted by Dr. Robinson in her letter dated October 2, 2015, a date long before she was indicted, in which she wrote:

> "Ms. Esimai, as many patients with Dementia, was able to hide her deteriorating mental status by evading questions, smiling all the time and being repetitious - continuously questioning her family members about the same subject matters."

In her letter of April 16, 2016, Dr. Robinson wrote:

> "Ms. Esimai's ability to evade specific answers to questions, her cheerful-ness and her continuous questioning when she cannot remember things, are clearly her way of dealing with her memory impairment." Attachment to Def. Ex. A.

Dr. Hershberger testified to the same relationship between these "social graces" and her competence as follows:

> Ms. Esimai, in my opinion, has wonderful social skills and really powerful abilities to bond and communicate her people and those strengths of hers that happened long before she got sick have persisted and she relies on those to hide her illness from other people.
>
> If her condition was more severe and she had a severe dementia, she would lose that incite. She would lose the awareness that she was being forgetful. She

would no longer be trying to hide her cognitive problems.

But in that middle state where she has a hint of awareness that something is wrong she gets along, she goes along to get by with people as a way of avoiding the shame and embarrassment of forgetting. For people with moderate dementia it's a really embarrassing, emotionally painful situation to not recognize people you should know and know it. So in my opinion Ms. Esimai did that to me. She did that to Dr. Robinson and she did that to the special agent or the informant. Tr. at pp. 72-73.

4. The fourth question was "evidence of her memory impairment." His response entailed references to the assorted tests noted above, which revealed "a lot of inconsistencies" in the testing with him, which he attributed to "exaggerated or feigned cognitive impairment." Tr. at 34.

Dr. Morgan's responses on cross-examination are noteworthy. Having asserted on direct that her cognitive impairment was feigned, when then asked whether his position is that she is not cognitively impaired to any extent, his response was: "Well, it's really unclear to me. She may have a mild degree of cognitive impairment, but not a severe cognitive impairment." Tr. at 39. And, when asked whether given the defendant's medical history, her MRI's and her family's reports of forgetfulness, she is not feigning, "somehow making this up from whole cloth -- there must be some underlying level of impairment," he agreed that, "Even people with cognitive impairment can go on to exaggerate or malinger their defects." Tr. at 55.

At the very end of re-direct examination of Dr. Morgan, in answer to my question whether, based upon the transcripts of meetings the defendant had with her co-defendant and the confidential informant and nothing else, he formed an opinion about the defendant's cognitive

ability, the prerequisites for a determination whether she is competent, he replied, "Oh, I did, absolutely." Tr. at 56. (emphasis mine).

That response harks back to the inference the Court drew of the impact upon the conclusion those transcripts would foretell.

### Dr. Jason Hershberger

Dr. Hershberger, a psychiatrist, was qualified and received as an expert, was called to testify on behalf of the defendant. The opinion which he subsequently rendered was based on the Bureau of Prisons' medical records of the defendant: the medical records of Dr. Sandra Robinson, her primary care physician; an MRI; a tape recorded meeting of the defendant, her co-defendant and a confidential informant on March 8, 2016; an affidavit in support of a warrant for her arrest; a clinical interview and mental status examination of the defendant; and talks with members of her family, among others. Tr. at 61; Def. Ex. A.

He testified that the MRI ordered by Dr. Robinson and the cognitive concerns of her family were consistent with multiple mini strokes, symptomatic of people with dementing illnesses. Those findings and the reports of her family made prior to the concerns at issue in this case, provide significant support that she "was suffering from significant clinical dementing symptoms." (emphasis added). Tr. at 66-67. The diagnosis he reached was that the defendant was suffering from major neurocognitive disorder of moderate severity, which rendered her unfit to stand trial because, "she is incapable of retaining information necessary to support a factual understanding and rationally participate in a discussion with her attorney."

Relevant in contributing to conclusions that she was incompetent to stand trial were a variety of indicators manifested during Dr. Hershberger's interaction with her. For example: She claimed to have met him before; she did not know the day, date and year at the time; she was unaware of her current legal situation.

The Government's cross-examination of Dr. Hershberger was fixated primarily on whether he was conscious of the factor of deception in the defendant's answers to his questions, and of the possibility that she was lying and, overall, was malingering. Dr. Morgan's finding that the defendant's failure on the cognitive effort test, meaning her effort in taking the test was not sufficient, was an indication of malingering, was a diagnosis Dr. Herschberger characterized as, "a stretch." He testified that an inadequate effort can have many causes, such as fatigue, test confusion, and by a sense of shame out of concern about her ability to do well on the tests. Tr. at 69.

That fixation was manifested by an observation made by the agent in his report of the arrest of the defendant to which Dr. Hershberger made reference in his expert report. Agent Lomonico wrote:

> "Esimai did not know why she was arrested that day. She did not recall a meeting she just attended. Esimai did not know who Michael Ashley was [the pseudonym of undercover agent]. Esimai did not know she was getting $25,000 cash that day for the 72-17 Burchell Avenue property she owns."

The Government's cross examination in that regard was, in part, as follows:

Q:      So this is, in your opinion, the interaction with Agent Lam evidence --
further evidence of dementia?

A:      It's consistent with my findings that her short-term memory is so impaired
that she has difficulty remembering important relevant facts from day to day, and
that has been the clinical finding that preceded this arrest and happened at the time
of arrest and happened afterwards.

        And it's a central finding in my opinion that she suffers from a functional
limitation that renders her incapable of having a factual understanding of the criminal
proceedings before her today.

Q:      And it was not important to you to incorporate in this same section in your
report a reference to the fact that at least the possibility that she may have been lying
to the Agent Lomonico having been arrested before and prosecuted and pled guilty
before that she may have been engaged in deception because as an experienced person
in the criminal justice system she decided this time I'm not going to plead guilty, I'm
going to lie?  Tr. at 90-91.

Q:      What is your assessment of the fact -- what is your percentage of the chance
that Ms. Esimai lied to you during your interview; 50 percent, 50/50, 60/40 that
she didn't lie?  What was your percentage based upon all of your examination, 100
percent she told you the truth?  Tr. at 98.

**Ms. Esimai  - The Defendant**

Ms. Esimai was called to testify on her own behalf. She recognized Mr. Brill, her attorney, but didn't remember his name or what his job is. Tr. at 103-104. She did not remember meeting the AUSA or the special agent of the FBI, and did not know Lydia Hills or where, or in what context, she saw her before. Tr. at 105 and, compare, at 113. She knew she was in a federal building, Tr. at 106, but was unaware of the charges that brought her here. Tr. at 109-111.

I assume the risk of further burdening what is perhaps an already over-burdened opinion by replicating portions of Ms. Esimai's testimony. I do so in the belief that they contribute significantly in forming a just determination of her competence to stand trial. They are as follows:

Q:      Let's talk about this case for a minute. When you got out of prison, did you have any requirements that you were supposed to do after you got out?

A:      Requirements, I like what, please?

Q:      Well, did you owe anybody money from your case?

A:      From my case?

Q:      Uh-hum.

A:      Not that I can remember. I didn't give anybody money, or nobody didn't take any money from me.

Q:      Before you went to prison, did you plead guilty to something? Do you remember if you did that?

A:          I help might have.  I suppose I plead guilty.  I pleaded guilty, but the point

is I want to forget about this real estate because the bank told us -- their reps came

and told us specifically we are not giving loans to anybody with bad credit, so a lot

of people now decided to go ahead and apply for loans because they have excellent

credit, but they don't have enough income.  So this is what put me in trouble.

Q:          Right.  So after you went to court and you went to prison, do you know

what restitution is?

A:          Restitution is paying for, I suppose, the money that was lost.

Q:          And did you have to pay any restitution for your case?

A:          Not that I know of.

Q:          Do you know what forfeiture is?

A:          What?

Q:          Forfeiture?

A:          Forfeiture, it depends on what you're forfeiting.

Q:          Do you know what forfeiture was in relation to your case?

A:          Yeah, but what am I supposed to forfeit?

Q:          Do you know if you supposed to forfeit something?

A:    I don't know I think the decision was to pay a few – a couple of million dollars or go to prison.  I say I don't have a couple million dollars to pay, so that's why I went to prison.

Q:    Tell me a little bit about these houses that you own.

A:    I don't know too much about that.  The houses are really not mine.  One or two are mine and the rest belong to my children.

Q:    Okay.  And do you rent those houses out or do your children rent those houses out?

A:    Yeah, they do, but they don't do anything if the renters are not paying, okay, so the house, some of them have been foreclosed, but now I'm back, I say God help me, let's save some of these houses.  Because to fix them and put lights on, it is better for the children to fix the house, not have their name being damage.  The house is in their name and they're not collecting any rent and it does not make any sense.

Q:    Did you try to sell any of your houses to avoid paying restitution?

A:    No.  Why should I -- no.  That's not me.

Q:    Okay.  Did you try -- go ahead.

A:    No, I have some -- I have some brokers that are asking me what to do, if they want me -- I haven't done anything, but it's about time I wake up because these houses also all be foreclosed if nothing is done.  There was worker -- somebody

from FBI guy came to my house and say I'm to deliver house to foreclose.  He say allow your houses to foreclose, do something.  So I -- still need some help.  I mean, I find some brokers.  I have the right people to rent.  The point is that some people are squatting there.  They're paying nothing.  They're just living there for free.  So if I'm trying to get somebody who could get somebody there who can afford to pay rent so that the mortgage should be paid and then the houses will not be lost.

Q:          Okay.  Thank you.

A:          I have one more question.

Q:          Do you have something that you wanted to add?

A:          I have a question that I want to ask.  I don't want to waste your time, but the issue is this, with these houses, I have to know exactly what you first want  me to do.  Now that I'm here with you, you are the powers that be.  Can you tell me what you want to do with these houses?  Let them go or get it rented and start paying the mortgage, okay.

          The stupidity I did was to present a document that is not right.  Right now I am not going to do any such stupidity.  I need the houses rented.  The rent collected from the rental would be used to pay the mortgage.  So even if you make that, at least you do something.  That is what I want to do, because I don't want to do anything in secret.

At the end of her testimony, the Government announced, "I don't think I have any questions for the witness."  Tr. at 115.  Both sides rested.  The Government's closing statement was: "The Government relies on its expert and the tapes . . . .  I do not believe her testimony

-21-

today should be given any weight . . . . and I believe that your Honor should find her competent to proceed." Tr. at 117.

Mr. Brill, defense counsel, in his closing remarks stated: "I think that's entirely clear, that Ms. Esimai, . . . is unable to communicate with me in any meaningful way, and that's the bottom-line. Yes, she can refer to her history. She can refer to her past real estate business and she has frames of reference by which she can get on with a conversation, but she certainly cannot have an ongoing relationship talking about a charge that she forgets about ten minutes after it is explained to her over and over and over again. That's the problem. I cannot in any way have a conversation about what's going on in this case because I will just constantly for hours going around in circles and we can never get to the meat of it because we never get past what the charge is and what the basis for the charge is." Tr. at 118.

At the beginning of this opinion, reference was made to a negative inference I drew in anticipation of the effect the covert recordings of the meetings of March 7 and March 8 would have on the opinion of Ms. Esimai's competence. A reading of the entire transcript in the shadow of the March 7 meeting in particular, drives me to conclude that the significant reliance placed upon those recordings by the Government and by Dr. Morgan in bolstering their opinions of Ms. Esimai's competence, were based upon an interpretation of snippets of Ms. Esimai's contribution to those meetings, which was exaggerated and untenable. There isn't a jot or a tittle in those transcripts that would suggest, even vaguely, that Ms. Esimai is competent to stand trial, an interpretation reminiscent of Justice Frankfurter's view on the construction of statutes as making a difference whether one comes to it with a question or an answer. Frankfurter, *Some Reflections*

*on the Reading of Statutes*, 47 Columbia Law Review 527, 529 (1947).  In my view, they came to those transcripts with an answer.

## Discussion

The requirement that a defendant be competent to stand trial is rooted in the notions of due process.  The Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process."  The statute 18 U.S.C. § 4241(a) declares a person to be incompetent "to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *Cooper v. California*, 517 U.S. 348, 354 (1996).  Perhaps the most cited case on the meaning of "incompetent" is *Dusky v. United States,* 362 U.S. 402 (1960) in which that Court wrote: "[T]hat it is not enough for the district judge to find that the defendant (is) oriented to time and place and (has) some recollection of events, but that the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational as well as factual understanding of the proceedings against him."  That unadorned definition is stunningly descriptive of Ms. Esimai.  A careful, objective reading of the transcripts upon which the Government so heavily relies reflects, for want of a more semantically precise characterization, some orientation to that time and place or some recollection of events, but I find it abundantly clear that, by a preponderance of the evidence, she is unfit to stand trial.  That finding is required not simply by the tersely cogent teaching of *Dusky,* but is also driven by the commentary which countless cases have added to it, to cite just a few: In *Godinez v. Moran*, 509 U.S. 389, 403 (1993) (Kennedy, J. concurring) wrote: "What is at issue here is whether the defendant has sufficient competence to take part in a criminal proceeding and to make the decisions throughout

-23-

the course.  This is not to imply that mental competence is the only aspect of a defendant's state

of mind that is relevant during criminal proceedings."  An inability to make any meaningful

contribution to his defense marks a defendant as incompetent to stand trial.  *United States v.*

*Gigante*, 982 F. Supp. 140, 166 (E.D.N.Y. 1997).  Although in another context, the Court noted

"the importance of uninhibited communication between a defendant and his attorney" and the

likelihood of the necessity of crucial decisions to be made by counsel which may require

consultation with the defendant.  *See*, *Morris v. Slappy*, 461 U.S. 1, 21 (1983).  Those necessities

can only be served with a defendant who is competent.

I have considered the commentary elaborating conceptually on the pristine statement of

competence declared in § 4241(a) and in *Dusky* in evaluating the evidence and, as clearly

indicated above, found the testimony of Dr. Hershberger more informative and convincing than

Dr. Morgan's, but significant too was the statement of defense counsel about the defendant's

inability to communicate with him, assist him in any way in the defense of her case, and his

judgment about her state of mind.  His opinion about her ability to understand the nature of the

proceedings and to cooperate with him in preparing her defense is significant and probative.  *Roth*

*v. Zelker*, 455 F.2d 1105, 1108 (2d Cir. 1972), cert. denied, 408 U.S. 937 (1972).  The Supreme

Court endorsed that significant and probative value in *Medina v. California*, 505 U.S. 437, 450

(1992) when it wrote that, "The defendant's inability to assist counsel can, in and of itself,

constitute probative evidence of incompetence, and defense counsel will often have the best

informed view of the defendant's ability to participate in his defense."  Judge Bazelon, who wrote

extensively on insanity in the criminal law, *see, e.g., Durham v. United States*, 214 F.2d 862

(1954) expressed the significance of counsel's assessment of his client's competence to stand trial

more expansively, and also instructively, as follows: "counsel's firsthand evaluation of defendant's ability to consult on his case and to understand the charges and proceedings against him may be as valuable as an expert psychiatric opinion on his competency." *United States v. David,* 511 F.2d 355, 360 (D.C. Cir. 1975).

Significant, too, was the comportment of the defendant as I observed her and listened to her as she testified on her own behalf. The testimony of Dr. Hershberger and the report of Dr. Robinson concerning her ability to hide her deteriorating mental ability by her social skills became manifest.

The standard of proof as to the determination of competence is by a preponderance of the evidence, a standard which is undisputed. *See also,* § 4241(d). Less so is the question of whether the burden of proof is borne by the Government or by the defendant. The cases which note the disputed view as to which party bears the burden of proof are collected in *Medina v. California*, 505 U.S. 437, 447-48 (1992); *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995). This Circuit has not definitively decided the issue.[1] The issue has been evaded by a holding that, "The allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise: that is, where the evidence that a defendant is competent is just as strong as the evidence he is incompetent." *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995) quoting *Medina v. California*, 505 U.S. 437, 449 (1992). That is not the case here. If the burden of proof that the defendant is incompetent is regarded as

---

[1]In *Cooper v. Oklahoma*, 517 U.S. 348, 361 (1996), the Court, surely inadvertently wrote that, "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence" citing 18 U.S.C. § 4241.

the defendant's, she carried it; if the burden to prove that she is competent is on the Government, they did not.

The difficult consequence of the conclusion that the defendant is not competent to stand trial is the command of 18 U.S.C. § 4241(d)(1) which provides that if that determination is made then: ". . . the court <u>shall</u> commit the defendant to the custody of the Attorney General. The Attorney General <u>shall</u> hospitalize the defendant for treatment in a suitable facility—

> (1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward;" (emphasis added).

The constitutionality of that statutory provision has been challenged, albeit unsuccessfully. The argument in support of that challenge is that the defendant is presumed innocent of the crime with which she is charged; her guilt has not yet been determined; she has been released on bond since the day of her arrest, reflecting the determination that she is not a risk of flight, nor is she a danger to herself or to the community. There has been no finding that an in-hospital examination by the Government's experts is necessary to conclude that there is a "substantial probability" that she will, in the future, attain the capacity to stand trial. Committing Ms. Esimai to the custody of the Attorney General will certainly be an impairment of her liberty. *See, United States v. Filippi*, 211 F.3d 649 (1st Cir. 2000). The validity of § 4241(d), however, is implicitly supported by and in language borrowed from *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) where the Court wrote

that "a person charged with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *See*, S. Rep. No. 98-225, 236 (1984). U.S. Code Cong. & Admin. News 3182.

The justification for the statute's command was stated in the recent opinion of the Court of Appeals, *United States v. Magassouba*, 544 F.3d 387, 402-403 (2d Cir. 2008) to be two-fold: the first being the sovereign's "power to bring an accused to trial" as "fundamental to a scheme of ordered liberty and prerequisite to social justice and peace" quoting Justice Brennan's concurrence in *Illinois v. Allen*, 397 U.S. 337, 347 (1970); and the second, stated to be that "consistent with due process, a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense, may not be subjected to a trial." The explicit limitation upon the sovereign's power is then "accommodated" by allowing "the Government to commit an incompetent defendant to custody in order to render him competent to stand trial."[2] *Magassouba, supra*, at 403. Notwithstanding that incongruity, it is too late in the day to question that, once being found incompetent, commitment is mandatory, leaving the district court with no case-by-case choice. *Magassouba, supra*, at 404-405.

---

[2]The defendant's commitment "to custody in order to <u>render</u> him competent to stand trial" may be regarded as a telling inversion of "substantial probability that she would attain competence." 18 U.S.C. § 4241(d)(1).

The question then is, commitment for how long?  The statute is explicit.  "The Attorney General <u>shall</u> hospitalize . . . . for . . . . a reasonable time, but <u>not to exceed</u> four months . . . ."  There is no evidence in the record, nor is the Court aware of any study or data that would permit a finding, with specificity, as to how much time, up to four months, is needed to determine the probability, if any, of attaining competence to stand trial in the foreseeable future.  Nor is the Court aware if there continues to be "substantial doubt whether the rationale for pretrial commitment – that care or treatment will aid the accused in attaining competency – is empirically valid" or if there continues to be a "lack of 'exactitude' with which psychiatry can predict the future course of mental illness."  *See, Jackson v. Indiana,* 406 U.S. 715, 725, 735 (1972).  It is reasonable to assume that four months was the arbitrary determination the Supreme Court was reluctant to make that Congress was not.  *See, Jackson*, 406 U.S. at 738: "Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his commitment must be justified by progress toward that goal.  In light of differing state procedures and a lack of evidence in this record, <u>we do not think it is appropriate for us to prescribe arbitrary time limits</u>." (emphasis mine).

It is interesting to note that if a psychiatric or psychological examination had been ordered pursuant to § 4241(b) prior to the hearing, to determine whether the defendant is incompetent to stand trial, she may have been committed for that purpose for not more than thirty days.

§ 4247(b) and (c).  It is more interesting to note that the director of the facility to which she may have been committed shall prepare <u>semiannual</u> reports, but no date is provided by which the psychiatrist or psychologist is to file his report to the Court and counsel.  § 4247(c)(4)(A).  The arbitrariness of the variously provided time limitation is plainly manifest.

What is clear, however, is that there is nothing in the record to warrant or even suggest a finding that four months or any other specified time is necessary to permit a competent examiner to report on the substantial probability that she will attain competence to stand trial.

The question regarding the duration of the commitment mandated by § 4241(d)(1) being addressed above, the question then is, where should she be committed? Two statutes are relevant to its response; they are:

> § 4247(a)(2) defines "suitable facility" to mean "a facility that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant;

> § 4247(i) defines the Authority and Responsibility of the Attorney General to be that he –
>> (A) may contract with a State, a political subdivision, a locality, or a private agency for the confinement, hospitalization, care, or treatment of, or the provision of services to, a person committed to his custody pursuant to this chapter.

The "nature of the offenses" with which the defendant is charged are conspiracy to obstruct and obstruction of an official proceeding, non-violent offenses.

The characterizations of the defendant are well known. She is a Nigerian woman, approximately 72 years old, in frail health, who has been released on bond since April 2016, is neither a flight risk or a danger to the community. The official proceeding she is accused of

conspiring to obstruct is an Order of Restitution directing her to make following a conviction of conspiring to commit wire and bank fraud in the S.D.N.Y. That aside, she lived a peaceful and law-abiding life.

The discretion conferred upon the Attorney General regarding the place to which the defendant may be committed is very broad. While the Court has no authority to direct the exercise of his discretion, it may, properly request what is believed to be the just and appropriate exercise of it in accordance with the statute. Toward that end, there is nothing in the record to require or suggest that the determination of a foreseeable attainment of competence can only be made if the defendant were confined. A reading of the relevant statutes would support the reasonable assertion that it is not.

Returning to the principal statute, § 4241(d)(1), it provides, in relevant part, "The Attorney General shall hospitalize the defendant <u>for</u> <u>treatment</u> in a suitable facility . . . ." (emphasis mine).

§ 4247(a)(2) defines "suitable facility" to mean one "that is suitable to provide <u>care or</u> <u>treatment given the nature of the offense and the characteristics of the defendant."</u> The nature of the offense and the characteristics of the defendant are significant in determining facility suitability and care <u>or</u> treatment. If the defendant was denied bail because he was a flight risk or charged with a crime of violence and a danger to the community, the "nature of the offense and characteristics of the defendant" would counsel a facility of confinement and care his characteristics dictate. Given this defendant, who has been released on bond, is not a flight risk

and not a danger to the community, facility suitability would not require confinement or care, but treatment.

§4247(i)(A) set out above provides the variety of purposes and entities with which the Attorney General may contract clearly bespeaking choices, whether confinement or treatment, geared to the nature of the offense and characteristics of the defendant.

For all the reasons that have been given above, namely, the absence of any evidence that the determination for which this Order is mandated cannot be made in less than four months, I commit the defendant to the custody of the Attorney General for a period of 45 days, in a facility close to the Court, to determine whether there is substantial probability that, in the foreseeable future, she will attain the capacity to stand trial. A report as to the status of that commitment shall be filed in the Court at the end of thirty days with copies provided to counsel.

In the absence of any evidence that the required determination and such treatments as may be appropriate can only be made while the defendant is confined; in the absence of any evidence that she is a risk of flight or a danger to the community; given the presumption of innocence its meaningful due and given an interpretation of the relevant statutes in accordance with its terms; interpreting those words by what they mean to us here and now, not when they were written; I strenuously recommend and urge the Attorney General not to confine this 72 year old woman, who is not in optimal health, but permit the necessary treatment and determinations to be made while she remains on bond, or directed to home confinement.

SO ORDERED.

Dated:        Brooklyn, New York

November 17, 2017

_____

I. Leo Glasser

Senior United States District Judge